## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| **LORIE A PEARL,** | : | |
| | : | Bky. No. 12-11372 ELF |
| Debtor. | : | |
| | : | |
| | : | |
| **DAVID FOGG, As Guardian of The Estate** | : | |
| **of Alice Brown, An Incapacitated Person,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **LORIE A PEARL,** | : | Adv. No. 12-0382 |
| | : | |
| Defendant. | : | |
| | : | |

# O P I N I O N

## I. INTRODUCTION

Earlier this year, the Supreme Court issued its decision in <u>Bullock v. BankChampaign,</u> <u>N.A.,</u> 133 S. Ct. 1754 (2013), resolving an issue of bankruptcy law that divided the lower courts for close to 100 years. That issue was whether 11 U.S.C. §523(a)(4), which provides that a debt "for . . . defalcation while acting in a fiduciary capacity" is nondischargeable in a chapter 7 case, requires any level of scienter (and if so, what degree of scienter).

In <u>Bullock</u>, the Court held that "defalcation" under §523(a)(4) requires a heightened level of scienter. For a debt to be nondischargeable under §523(a)(4), the Debtor's conduct must either (1) "involve bad faith, moral turpitude, or other immoral conduct;" or (2) must have been

1

"reckless," i.e., involving a conscious disregard or a willful blindness to a substantial and

unjustifiable risk that the conduct violated the debtor's fiduciary duty.  133 S. Ct. at 1757.

This adversary proceeding is the first nondischargeability determination in this court

since Bullock was decided.  It arises from a family dispute regarding the management of the

guardianship estate of an incapacitated 60 year old woman, Alice Brown ("Ms. Brown").  The

plaintiff is David Fogg ("the Plaintiff"), who is Ms. Brown's brother, and her current, court-

appointed guardian.  The Defendant is Lorie Pearl ("the Debtor"), the debtor in this bankruptcy

case.  The Debtor is Ms. Brown's daughter (and the Plaintiff's niece).  The Debtor served as her

mother's guardian before the state court removed her and appointed the Plaintiff as her

replacement.

The Plaintiff claims that, during the period of the Debtor's guardianship, the Debtor

breached her fiduciary duties and that the breach constituted a "defalcation" under 11 U.S.C.

§523(a)(4), rendering the resulting debt nondischargeable.  The debt at issue consists of a

$58,396.42 "surcharge" imposed by the state court ("the Surcharge"), plus claims for an

additional surcharge that had not yet been requested by the Plaintiff prior to the Debtor's

bankruptcy filing ("the Claimed Additional Surcharge").

Based on the evidence presented at trial of this adversary proceeding, I conclude that the

Plaintiff has proven that the debts arising from the losses suffered by Ms. Brown's guardianship

estate during the Debtor's tenure as guardian  - both the debt already determined by the state

court and the claimed debt pending when the Debtor filed this bankruptcy case  – together

constitute a debt for defalcation that is nondischargeable under 11 U.S.C. §523(a)(4).[1]

## II.  PROCEDURAL HISTORY

On February 16, 2012, the Debtor filed a chapter 7 bankruptcy petition.  (N.T. at 61-62).

On May 11, 2011, the Plaintiff initiated this adversary proceeding by filing a complaint pursuant

to 11 U.S.C. §§523(a)(4) and (6) seeking a determination that the Surcharge and the Claimed

Additional Surcharge are excepted from the Debtor's discharge.  The Debtor's chapter 7

discharge was granted on November 7, 2013.

Trial of this adversary proceeding was held and concluded on February 22, 2013.  Three

(3) witnesses testified: (1) the Debtor, (2) the Plaintiff, and (3) Richard Magee, Jr. (the Plaintiff's

counsel in the state court guardianship proceedings).

After the trial, I placed the matter in suspense pending the outcome of the U.S. Supreme

Court's decision in Bullock v. Bank-Champaign, N.A.  On May 20, 2013, shortly after the

Supreme Court's announcement of its decision in Bullock, I entered an order removing this

proceeding from the suspense docket and establishing a briefing schedule.  Briefing was

completed on June 19, 2013.

## III.  FINDINGS OF FACT

I make the following findings of fact based upon the testimonial and documentary

---

[1]       The Plaintiff also claimed that the debt is nondischargeable pursuant to 11 U.S.C.
§523(a)(6).  In light of my determination that the debt is nondischargeable under §523(a)(4), I need not
reach the §523(a)(6) issue.

evidence presented at trial and the undisputed facts set forth in the parties' Joint Pretrial

Statement.


### The Parties

1.    The Debtor is Ms. Brown's daughter.  (Joint Pretrial Statement ¶6).

2.    The Plaintiff is Ms. Brown's brother and the Debtor's uncle.  (Id. ¶7).


### Pearl's Appointment as Guardian of Ms. Brown's Estate

3.    Ms. Brown was born on November 16, 1946. (Id. ¶5)

4.    In the fall of 2006, the Debtor came to learn that Ms. Brown's mental health was

      deteriorating.  (Notes of Testimony ("N.T.") at 83).

5.    The Debtor also came to learn that Ms. Brown owed approximately $50,000.00 in back

      taxes and that her residence, 124 Rodney Circle in Bryn Mawr, Pennsylvania ("the Rodney

      Circle Property") had been sold in a tax sale for $130,000.00.  (Id. at 83, 85).

6.    In the fall of 2006, the Rodney Circle Property was in very poor condition.  It was moldy

      and had no heat, air conditioning or running water.  (Id. at 83).

7.    At some point after discovering the existence of her mother's housing crisis, the Debtor met

      with family members  to discuss the situation.  Those family members included the Plaintiff,

      the Plaintiff's spouse, Ms. Brown's sister (the Debtor's aunt) and the Debtor's brother.[2]  (Id.

---

[2]        In response to a question asking him whether he discussed Ms. Brown's situation with
the Debtor and other family members, the Plaintiff testified vaguely (in the passive voice) that Ms.
Brown's situation "was discussed."  (N.T. at 55).  He later testified that he was not involved in
recovering the Rodney Circle Property; he couldn't recall whether he was at any family discussion.  (Id.
                                                                                        (continued...)

at 84).

8.   At the meeting, the family agreed that the Debtor would seek appointment as her mother's

guardian and that they (the family) would try to save the house.  (Id. at 84-85).

9.   On November 27, 2006, the Debtor filed a Petition for Adjudication of Incapacity and for an

Appointment of Plenary Guardian of the Person and Estate for Alice Brown in the Delaware

County Court of Common Pleas of Pennsylvania ("the C.P. Court").  (Ex. Fogg-1).

10.  The Debtor's aunt paid the attorney's fees for the petition to set aside the sale.  (N.T. at 87).

11.  The Debtor paid the attorney's fees for the petition to appoint her as guardian.  (Id.).

12.  On January 22, 2007, the C.P. Court found Alice Brown to be an incapacitated person, who

could not manage her personal or financial affairs and appointed the Debtor as the plenary

guardian of Alice Brown's person and her estate ("the Estate").  (Ex. Fogg–2).

13.  Upon her appointment, the Debtor received a description from the Orphan's Court of the

rules and duties for conducting the guardianship ("the Orphan's Court Rules").  (N.T. at 63;

Ex. Fogg–19 at 1).

14.  At the time of the Debtor's appointment as guardian, the Orphan's Court Rules provided, in

relevant part, that:

      a.   the guardian of the Estate must manage the assets using the "standard of
           reasonable prudence" and that "risky investments are not permitted, unless
           specifically authorized by the Court."

      b.   court permission is required before selling real estate or using principal;

---

[2](...continued)
at 56).  I find that he was involved in the discussion, but did not participate actively in the family's
efforts to set aside the tax sale.

    c.   an Inventory with the Court must be filed within ninety (90) days of the appointment setting forth, to the best of her ability, the assets of the Incapacitated Person;

    d.   an annual report must first be filed within six (6) months of the appointment and, thereafter, one (1) year after the first annual report.  The Orphan's Court provides a form for the annual report, which requires a detailed description of the current principal of the estate and how it is invested, the income and expenses of the principal and/or income and the needs of the incapacitated person for which the guardian provided for financially since the date of the last report or date of appointment.

    e.   the guardian is a fiduciary and must exercise "prudent judgment in the management of the Estate of the Incapacitated Person for his benefit only and to avoid conflicts of interest or decisions which may benefit yourself."

(Ex. Fogg–19).

15.  The Debtor was represented by counsel in the proceedings that resulted in her appointment as her mother's plenary guardian.  (N.T. at 63).

16.  The Debtor's counsel advised her that she needed to follow the Orphans' Court Rules.  (Id. at 63).

17.  The Debtor "tried" to familiarize herself with the Orphan's Court Rules, but implied, in her testimony, that her obligations to her own immediate family may have hindered her.[3] Ultimately though, she testified: "I did, to the best of my ability, understand what I was to do. . . . [w]hat my responsibilities were."  (Id. at 67).

18.  The Debtor admitted, however, that she did not know that she was required to obtain permission from the court before selling real estate.  (Id. at 67-68).

19.  The Debtor's counsel also advised her to keep a journal of her mother's income and

---

[3]      The Debtor explained that she has one child with severe cerebral palsy and another child who suffers from seizures.  (N.T. at 98).

expenses in matters involving her mother's estate.  (<u>Id.</u>).

20.    The Debtor testified that she maintained the journal for approximately 20-21 months (nearly

the entire tenure of her guardianship), but later lost it.  (<u>Id.</u> at 63-66).[4]

### The Rodney Circle and Oakdale Properties

21.    After her appointment, the Debtor paid the outstanding taxes and was successful in setting

aside the tax sale of the Rodney Circle Property.  (<u>Id.</u> at 99).[5]

22.    However, due to the poor living conditions at the Rodney Circle property, in the summer of

2007, the Debtor and her husband moved Ms. Brown out of the property so that they could

prepare it for sale.  (<u>Id.</u> at 85; Ex. F-18, ¶11).[6]

23.    On June 17, 2007, to provide a place for Ms. Brown to reside, the Debtor and her husband

purchased, and titled in their own names, the property located at 16 Oakdale Avenue in

Norristown, Pennsylvania for $227,000.00 purchase price ('the Oakdale Property").  (Ex. F-

---

[4]    The Debtor had no records on her computer and did not start a new journal after she misplaced the original journal because she was already "in court" and was, or was about to be, removed as guardian. (N.T. at 65-66).  She testified that she attempted to reconstruct the original journal, but claimed that she did not know where the reconstruction was at the time of trial. (N.T. at 66-67).  That said, she testified that she believed the journal was not critical because the checks drawn on the Estate account were written in duplicate; so, she had copies of them. (N.T. at 66).

[5]    The Debtor laid out a portion of the unpaid taxes (approximately $13,000.00) and then paid the balance after the sale of the Rodney Street Property. (N.T. at 100).  The Debtor took a loan out on her credit card for the $13,000.00 and was later reimbursed from the Estate. (N.T. at 100).

[6]    To repair and restore the Rodney Circle Property, the Debtor and her husband arranged for the following work to be done: electrical, plumbing, drywall, mold removal and interior and exterior painting. (N.T. at 88).

18, ¶¶11-12; N.T. at 86).[7]

24. To pay for the Oakdale Property, the Debtor and her husband refinanced their own home to obtain the down payment of approximately $54,000.00, and took out a $180,000.00 mortgage loan against the Oakdale Property. (N.T. at 85; Ex. F-18, ¶12).

25. The monthly debt service on the second mortgage on their residence and the purchase money mortgage on the Oakdale Property totaled approximately $2,150.00 per month. (N.T. at 91).[8]

26. Generally, Ms. Brown lived alone at the Oakdale Property, but from time to time, the Debtor's two older stepchildren, who were in college, resided in the property. (Id.).

27. On June 22, 2007, the Debtor filed a petition seeking court permission to sell the Rodney Circle Property. (Ex. F-18, ¶8). The State Court granted the petition by a decree dated January 18, 2008. (Id. ¶9).

28. On January 31, 2008, the Debtor sold the Rodney Circle Property for $353,134.18. (Id. ¶10). The sale of the Rodney Circle Property effectively created the Estate.

29. From the time Ms. Brown moved into the Oakdale Property until the sale of the Rodney Circle Property (roughly June 2007 through January 2008), the Debtor paid for all of her mother's expenses because there were no estate funds to pay for her daily needs. (N.T. at

---

[7]       The Oakdale Property is single family home that is approximately 2000 square feet with a half of an acre of land and located in a desirable neighborhood. The downstairs has one bedroom, a kitchen, a living room and a dining room. The upstairs has a loft. (N.T. at 87; Ex F-18, ¶11).

[8]       The Debtor testified that the $180,000.00 mortgage on the property had a monthly payment of $1,650.00 and the second mortgage of $54,000.00 she took out on her home for the down payment on the Oakdale Property had a monthly payment of $500.00. (N.T. at 91).

87).[9]

30. The Debtor used some of the proceeds from the sale of the Rodney Street Property to
    reimburse her aunt, and herself and her husband for the expenses they advanced in setting
    aside the tax sale of the property and preparing it for sale.  (N.T. at 90).

31. After the sale of the Rodney Street Property, the Estate paid Ms. Brown's ongoing living
    expenses such as rent, groceries and utilities.  (Id. at 90-91).

32. The Debtor included, as part of the Ms. Brown's living expenses, a payment to herself of
    $2,000.00 per month for rent and utilities for the Oakdale Property.  That amount
    corresponded to most of the mortgage debt service on the property.  (Id. at 91; Ex. Fogg–18,
    ¶31-32).

33. The Plaintiff did not file a report with the C.P. Court in 2008, the year Ms. Brown's estate
    realized the $353,134.18 in net proceeds from the sale of the Rodney Circle Property.  (Ex.
    Fogg–18, ¶48).


## The Acquisition of the Florida Townhouse

34. On April 22, 2009, using Estate funds, the Debtor purchased a three bedroom/three
    bathroom town home located at 2389 Silver Palm Drive, Kissimmee, Florida for
    $159,000.00. ("the Florida Townhouse").  (Joint Pretrial Statement ¶13).

35. Although the funds used to purchase the Florida Townhouse came from the Estate, the

---

[9]    It appears that Ms. Brown's sole source of income in that time period was $593.00 per
month in Social Security benefits.  (Ex. Fogg–18 at ¶13).

Debtor titled the property in her own name.  (Id. at 103-104; Ex. Fogg–18, ¶15-16).[10]

36.  Although she did not title the Florida Townhouse in Ms. Brown's name, the Debtor sought

    to justify the purchase of the Florida Townhouse as an investment for the Estate.[11]  She

    testified that she made this investment decision based on advice from friends and her own

    internet research.  She believed the stock market was too volatile and she did not consider

    other forms of investment.  (N.T. at 74; Ex. Fogg–18, ¶24).

37.  The Debtor did not consult with an attorney, accountant, or other professional before

    purchasing the Florida Townhouse.  She did consult with relatives and, to her recollection,

    no one raised any objection.  In other words, there was consensus among the family to

    purchase the townhouse in Florida.  The Plaintiff was not included in those discussions.  (Id.

    at 96-97; 104-05).

38.  After purchasing the Florida Townhouse, the Debtor spent an additional $42,000.00 of

    Estate funds to redecorate and refurnish the property.  (Ex. Fogg–18, ¶17).

39.  The purchase of the Florida Townhouse and the subsequent renovation cost the Estate

    roughly $202,000.00.  (Id. ¶23).

40.  The Debtor did not obtain court approval to purchase the Florida Townhouse using funds

    from the Estate because she thought she did not need it.  (Id. at 98; Ex. Fogg– 8, ¶22).

---

[10]      The Debtor offered no explanation why titled a property purchased with Estate funds in her own name.  She stated that she was "going to put it in her name," but did not know why she "just didn't do it initially."  (N.T. at 104).

[11]      The Debtor called the Florida Townhouse "Alice's Wonderland" in honor of her mother. (N.T. at 15, 95).

41. The Debtor believed the Florida Townhouse would eventually generate income for her

mother.  Her intention was to subsidize Ms. Brown's income from Social Security with

rental income from the Florida Townhouse.  (N.T. at 92; Ex. Fogg–18, ¶18).

42. The Debtor made one (1) visit with her family for two (2) days to the Florida Townhouse.

(N.T. at 93-94).[12]

43. Ms. Brown never visited the Florida property.  (Joint Pretrial Statement ¶17).

44. The Debtor received a total of $870.00 in rental income from the Florida Townhouse.  That

income went directly back into the property to pay a management company's expenses.  The

Florida property's sporadic rental income did not meet its costs.  (N.T. at 93).

45. Between April 2009 and October 2011, the Florida Townhouse depreciated in value.

### The Removal of the Debtor as Guardian

46. On November 13, 2009, the Plaintiff, filed a Petition for Review seeking a "clarification of

the proceeds from the sale" of the Rodney Circle Property.  (N.T. at 6).

47. On December 23, 2009, the C.P. Court issued a decree, effectuating the parties' agreement

that the Debtor remain as guardian of Ms. Brown's "person," but appointing the Plaintiff as

successor guardian of the Estate ("the December 23, 2009 Decree").  (Ex. Fogg–4).[13]

---

[12]    This issue was contested.  The Plaintiff characterized the visit as a leisure vacation,
implying that the Debtor purchased the property for her own use and enjoyment and the C.P. Court made
the finding that she and her family used the Florida Townhouse for their own vacation (see Ex. Fogg–18,
¶21).  In this court, the Debtor explained that the purpose of the one visit for a couple days, with her
small children, was to do some renovation work.  In ruling in this proceeding, I do not resolve this
particular factual issue, as I find other facts to be determinative of the nondischargeability issue.

[13]    The December 23, 2009 Decree also required that the Debtor:

(continued...)

48.  On March 26, 2010 the Debtor transfer title of the Florida Townhouse to Alice Brown.  (Ex. Fogg–5).

49.  On October 27, 2010, the C.P. Court removed the Debtor and appointed the Plaintiff as the guardian of Ms. Brown's "person."  (Ex. Fogg–6).

50.  The C.P. Court also issued an opinion that same day ("the October 27, 2010 Opinion") in which it found, inter alia, that the Debtor:

1.  failed to file a report in the year that the Estate of Alice Brown realized $353,000.00 from the sale of the Rodney Circle Property, (Ex. Fogg–18, ¶49);

2.  almost completely dissipated all of Alice Brown's Estate during her tenure as guardian, (Ex. Fogg–18, ¶50); and

3.  failed to petition the court prior to making most, if not all of her disbursements from the Estate, (Ex. Fogg–18, ¶51).

51.  In the October 27, 2010 Opinion, the C.P. Court also concluded, inter alia, that the Debtor:

1.  violated her fiduciary duty of care as set forth in 20 Pa. C.S.A. §7212.  (Ex. Fogg–18, ¶B.3.A.);

2.  violated the Prudent Investor Rule as set forth in 20 Pa. C.S.A. §7203.  (Ex. Fogg–18, ¶B.3.B.).;

3.  failed to obtain the court's permission prior to making substantial and

---

[13](...continued)

(1)  execute all necessary documents to transfer the Florida Townhouse to Alice Brown;

(2)  provide the Plaintiff and the court with a complete, informal accounting of her actions as guardian of Ms. Brown's estate, including receipts and expenditures; and

(3)  immediately provide the Plaintiff with information regarding any assets, including bank and credit union accounts held by Ms. Brown either jointly or solely in her name.

(Ex. Fogg–4).

significant invasions of the Estate of Alice Brown in violation of 20 Pa.
C.S.A. §5536(A).  (Ex. Fogg–18, ¶B.3.C.); and

4.  failed to file annual reports in violation of 20 Pa. C.S.A. §5521(C).  (Ex.
Fogg–18, ¶B.3.D.).

### The Surcharge Assessed by the C.P. Court

52.  On March 10, 2010, the Debtor filed a Petition for Allowance of Compensation and

Reimbursement to Guardian and Acknowledgment of Certain Surcharges ("the Petition for

Allowance").  (Ex. Fogg–1).

53.  On December 8, 2010, the court issued its decision on the Petition for Allowance, in which

it:

a.  disallowed approximately $70,000.00 of the approximately $170,000.00 in
expense allowances claimed by the Debtor; and

b.  "surcharged" the Debtor the sum of $58,396.42 ("the Surcharge").[14]

54.  The Surcharge did not include any loss the Estate suffered due to the purchase of the Florida

Townhouse because at the time the Surcharge was issued, the Florida Townhouse had been

sold.  (N.T. at 35-36).

---

[14]      It is not entirely clear why the amount disallowed by the C.P. Court (approximately
$70,000.00) exceeds the amount of the Surcharge $58,396.42.  I surmise that the higher amount includes
claimed expenses disallowed by the C.P. Court which not been yet disbursed to the Debtor from Estate
funds before she was removed as guardian.

55. The C.P. Court calculated the Surcharge against the Debtor as follows:

| | |
|---|---|
| **$366,523.41** | **Total Income**[15] |
| **(5,572.94)** | **balance in Estate Account** |
| **$360,950.47** | **expenditures from Estate** |
| | |
| **$360,950.47** | **expenditures from Estate** |
| **($159,500.00)** | **purchase of Florida Townhouse** |
| **($ 42,500,00)** | **purchase of furnishings for Florida Townhouse** |
| **($100,554.05)** | **allowances/credits** |
| **$  58,396.42** | **SURCHARGE** |

56. The C.P. Court apportioned the Surcharge as follows: $22,437.00 against the Debtor and her

husband, and the remaining $35,959.42 against the Debtor solely.

57. The Debtor appealed the December 8, 2010 Decree to the Superior Court.

58. On October 17, 2011, the Superior Court affirmed the CP Court's Surcharge order against

the Debtor but reversed the order insofar as it assessed the surcharge against the Debtor's

husband.  (Ex. Fogg–10).


**Sale of the Florida Property**

59. In March, 2010, the Plaintiff obtained an appraisal of the Florida Townhouse, which

concluded that the property had depreciated in value to $145,00.00.  (Ex. Fogg–18, ¶27).

---

[15]     The C.P. Court found that the Estate totaled $366,523.41 derived from

(1) proceeds in the amount of $353,134.18 from the sale of the Rodney Circle
Property on January 31, 2009;

(2) $12,519.23 in income from January 1, 2007 until December 31, 2009; and

(3) $870 in rental income from the Florida Townhouse.

60. In October, 2011, the Plaintiff filed a petition to sell the Florida Townhouse and its

   furnishings for a total purchase price of $132,500.00.  (Ex. Fogg–9, Fogg–12; N.T. at 59).

61. The sale of the Florida Townhouse closed on October 31, 2011, with the Estate receiving net

   proceeds of $117,914.60. (Ex. Fogg–13).

# IV.  DISCUSSION

## A.  Dischargeability Generally

One of the Bankruptcy Code's central purposes is to permit honest debtors to reorder

their financial affairs and obtain a "fresh start," unburdened by the weight of preexisting debt.

See, e.g., In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); In re Marques, 358 B.R. 188, 193

(Bankr. E.D. Pa. 2006).  Exceptions to discharge are construed strictly against creditors and

liberally in favor of debtors.  Cohn, 54 F.3d at 1113; In re Glunk, 455 B.R. 399, 415 (Bankr. E.D.

Pa. 2011).   A creditor objecting to the dischargeability of an indebtedness bears the burden of

proof.  Cohn, 54 F.3d at 1113; In re Kates, 485 B.R. 86, 100 (Bankr. E.D. Pa. 2012).  The

creditor must establish the elements under §523(a) by a preponderance of the evidence.  Grogan

v. Garner, 498 U.S. 279, 291 (1991); Kates, 485 B.R. at 100 (citations omitted).

## B.  11 U.S.C. §523(a)(4) Exception to Discharge

### 1.

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny."  11 U.S.C. §523(a)(4).

Section 523(a)(4) is divided into three (3) parts. The first part is the "fiduciary prong" and it requires the creditor to establish that the debtor (1) was in a fiduciary relationship with the creditor, and (2) committed fraud or defalcation within the scope of that fiduciary relationship. The second and third parts do not require proof of an existing fiduciary relationship, but rather, proof that the debtor committed embezzlement or larceny, as those terms are defined by federal common law.

In re Bell, 498 B.R. 463, 477 (Bankr. E.D. Pa. 2013) (citations omitted).

Embezzlement and larceny are not at issue in this adversary proceeding. The Plaintiff limits his nondischargeability claim to the fiduciary prong of §523(a)(4).

Under the fiduciary prong of §523(a)(4), a plaintiff must prove that (1) the debtor was acting in a fiduciary capacity; and (2) while acting in that capacity, the debtor engaged in fraud or defalcation. E.g., In re Tyson, 450 B.R. 514 (Bankr. E.D. Pa. 2011).

Not surprisingly, considering the nature of the Debtor's role as the guardian of the Estate of her incapacitated mother, the Debtor does not dispute that she was acting in a fiduciary capacity in the almost two (2) year period when she served as guardian. For the Plaintiff's part, he does not assert that the Debtor's conduct rose to the level of fraud. Thus, the only issue in this proceeding is whether the Surcharge imposed by the C.P. Court and the Plaintiff's unresolved Claimed Additional Surcharge (relating to the acquisition of the Florida Townshouse) constitute a defalcation within the meaning of §523(a)(4).

## 2.

Defalcation under 11 U.S.C. §523(a)(4) is a "failure to account for funds entrusted to a fiduciary." In re Roemmele, 2011 WL 4804833, at *5 (Bankr. E.D. Pa. 2011) (citations omitted). As stated at the outset of this Opinion, in Bullock, the Supreme Court resolved a long-standing

16

split of authority regarding the scienter level required to establish a defalcation under

§523(a)(4).[16]   The Court held that defalcation requires a level of scienter "involving knowledge

of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."

133 S. Ct. at 1757.  The Court explained that

> where the conduct at issue does not involve bad faith, moral turpitude, or other
> immoral conduct, the term requires an intentional wrong. We include as
> intentional not only conduct that the fiduciary knows is improper but also reckless
> conduct of the kind that the criminal law often treats as the equivalent. Thus, we
> include reckless conduct of the kind set forth in the Model Penal Code. Where
> actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if
> the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and
> unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. That
> risk "must be of such a nature and degree that, considering the nature and purpose
> of the actor's conduct and the circumstances known to him, its disregard involves
> *a gross deviation* from the standard of conduct that a law-abiding person would
> observe in the actor's situation."

Id. (emphasis in original).

I read Bullock to create two (2) scienter levels that may constitute a nondischargeable

defalcation under §523(a)(4).  In one (1) category is a defalcation involving "bad faith, moral

turpitude, or other immoral conduct," (such as self dealing).  In a second category is a defalcation

requiring something less: "recklessness," which the Court described as a conscious disregard of,

or a willful blindness to, a substantial and unjustifiable risk.

The second type of nondischargeable defalcation set out in Bullock, is tailored for

---

[16]      Prior to Bullock, at one end of the spectrum were cases that held that an innocent mistake
resulting from a failure to fully account for funds handled in a fiduciary capacity constitute defalcation.
At the other end were cases holding that the fiduciary's conduct must be reckless.  In the middle, were
cases holding that a fiduciary's negligence would give rise to a defalcation.  Tyson, 450 B.R. at 524-525
(Bankr.E.D. Pa. 2011) (citing cases).  In Tyson, I rejected the "innocent mistake" line of cases, but found
it unnecessary to decide between the other two (2) lines of cases in order to decide the case then before
the court.

conduct that falls between "mere" negligence and a specific intent to injure.  Delineating the

boundaries of this thin territory between negligent conduct and intentionally wrongful conduct

requires a somewhat nuanced analysis, involving both qualitative and quantitative considerations.

Qualitatively speaking, <u>Bullock</u> makes clear that the "recklessness" required to constitute

defalcation under §523(a)(4) is not merely a heightened form of negligence, at least insofar as

negligence involves a standard of conduct that is measured objectively, <u>i.e.</u>, based on the

behavioral norms of a "reasonable person."  Rather, the recklessness required for defalcation

under §523(a)(4) requires consideration of the debtor's subjective state of mind.  This is clear

from the Court's remand of the case on the ground that the Court of Appeals (erroneously)

applied a "standard of objective recklessness."  133 S. Ct. at 1761.

Equally significant in this regard is the Supreme Court's incorporation of the recklessness

standard set forth in the Model Penal Code.  The Model Penal Code states:

> A person acts recklessly . . .  when he **consciously disregards** a substantial and
> unjustifiable risk that the material element exists or will result from his conduct.
> The risk must be of such a nature and degree that, considering the nature and
> purpose of the actor's conduct **and the circumstances known to him**, its
> disregard involves a gross deviation from the standard of conduct that a
> law-abiding person would observe in the actor's situation.

Model Penal Code §2.02.

<u>Bullock</u>'s reference to §2.02 of the Model Penal Code suggests that the §523(a)(4)

recklessness determination is a hybrid of the subjective and objective.  The court must consider

the debtor's actual knowledge and circumstances (<u>i.e.</u>, the subjective) and then decide whether

the related conduct constituted a gross deviation from legal standards of conduct (<u>i.e.</u>, the

objective).

Quantitatively, the Supreme Court's favorable citation of two (2) federal appeals court decisions, (In re Baylis, 313 F.3d 9 (1st Cir. 2002) and In re Hyman, 502 F.3d 61 (2d Cir. 2007)), indicates that the deviation from the appropriate, objective standard of conduct must be substantial.[17]

In Baylis, the court stated that for an act to be deemed defalcation within the meaning of §523(a)(4), "it must be a serious one" and the plaintiff must show that the debtor's actions "were so egregious that they come close to the level that would be required to prove fraud, embezzlement, or larceny." 313 F.3d at 19, 20.  In Hyman, the court followed Baylis and further explained: "§523(a)(4) requires a showing of conscious misbehavior or extreme recklessness  -  a showing akin to the showing required for scienter in the securities law context."  502 F.3d at 68.

In the securities law context, our Court of Appeals has defined recklessness as "[h]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an **extreme departure** from the standards of ordinary care  . . .  which presents a danger . . .  that is either known to the defendant or is so obvious that the actor must have been aware of it."  U.S. S.E.C. v. Infinity Group Co., 212 F.3d 180, 192 (3d Cir. 2000) (emphasis added) (quoting McLean v. Alexander, 599 F.2d 1190,1197 (3d Cir. 1979)).

With these principles in mind, I now consider the conduct at issue in this case.

---

[17]    I observe that it is likely that the qualitative and quantitative aspects of recklessness under §523(a)(4) are likely to work in tandem in court decisions: the greater the deviation from the standard of conduct, the more likely the court will find that the debtor consciously disregarded his duties or wilfully blinded himself to those duties.

## C.  Evaluation of the Debtor's Conduct

### 1.

The conduct giving rise to the Plaintiff's defalcation claim falls into two (2) factual categories: (1) the Debtor's expenditure of Estate funds on Ms. Brown's day-to-day needs (i.e., the Surcharge of $58,396.42); and (2) the Estate's loss caused by the acquisition of the Florida Townhouse (i.e., the Claimed Additional Surcharge of approximately $84,000.00).[18]  The Plaintiff contends that the Debtor breached her fiduciary duty with respect to both claims and that the Estate's losses constitute nondischargeable defalcations under 11 U.S.C. §523(a)(4).

The Plaintiff relies heavily on the rulings of the C.P. Court and, unquestionably, the C.P. Court ruled that the Debtor breached her fiduciary duties.  However, not all breaches of fiduciary duties rise to the level of a defalcation under §523(a)(4).  Indeed, in Pennsylvania, a fiduciary is held to the legal standard of "reasonable care" in making investment and management decisions. 20 Pa. C.S. §7212; see also In re Scheidmantel, 868 A.2d 464, 482-83 (Pa. Super. Ct. 2005) (discussing cases decided prior to effective date of 20 Pa. C.S. §7212).

With respect to the Surcharge imposed by the C.P. Court, there has been a judicial determination that the Debtor failed to exercise reasonable care.  This negligence standard falls below the recklessness scienter required for a finding of defalcation under §523(a)(4).  Therefore, the C.P. Court decision imposing the Surcharge is conclusive on the subject whether the

---

[18]     I calculate this approximation by subtracting the $117,000.00 net proceeds on re-sale from the sum of the original purchase price ($159,000.00) and the cost of the furnishings ($42,000.00).

Surcharge is a valid debt,[19] but is not conclusive on the issue of nondischargeability.[20]  With

respect to the Surcharge, as well as the unresolved Claimed Additional Surcharge, based on the

evidentiary record presented in this court, I must evaluate the Debtor's decision making and

management of the Estate under the recklessness standard set out <u>Bullock</u>.


**2.**

In considering the Debtor's degree of culpability, I am mindful of the origins of the

fiduciary relationship between Ms. Brown and the Debtor.

At the outset of the fiduciary relationship, Ms. Brown was in dire straits.  The Rodney

Circle Property arguably was uninhabitable.  Even worse, it already had been lost in a tax sale.

Upon discovering her mother's desperate situation, the Debtor consulted other immediate family

members and, with some financial assistance, accepted the considerable responsibility of serving

as her care provider and financial guardian.  The Debtor then succeeded in her first important

task: redeeming the Rodney Circle Property and saving the substantial equity in the property.

Thereafter, the Debtor moved her mother out of Rodney Circle Property and into the

Oakdale Property.  This could not have been easy.  The Debtor makes a modest living and has six

---

[19]      For a debt to be nondischargeable pursuant to 11 U.S.C. §523(a), the plaintiff must
establish two (2) elements: (a) that a valid debt exists, and (b) the debt must satisfy all the requirements
under one of the subsections of §523(a).  <u>See, e.g.</u>,  <u>In re August</u>, 448 B.R. 331, 346–47 (Bankr. E.D. Pa.
2010).

[20]      <u>See Kates</u>, 485 B.R. at 103 (if plaintiff prevailed in prior litigation in establishing a claim
under a legal standard for scienter less rigorous than that required for nondischargeability under the
Bankruptcy Code, the prior court determination is not preclusive on the issue of nondischargeability); <u>see
also</u> <u>In re Styer</u>, 2013 WL 6234621, at *6-7 (Bankr. E.D. Pa. Dec. 2, 2013) (applying same principle).

(6) children, at least one (1) with special needs.  No doubt, the demands of managing the needs of

her immediate family were great, creating substantial pressure on the Debtor and her husband.

Despite this, they managed to finance the purchase of the Oakdale Property in order to carry out

what they understood to be Ms. Brown's desire  –  to live independently.  They also succeeded in

repairing the Rodney Circle Property and preparing it for marketing.  These latter efforts created

the Estate.  Without the sale, Ms. Brown would have had nothing.

The Debtor's initial efforts as guardian should not go unrecognized or unappreciated.

Her intentions appeared to be genuine.  Her efforts resulted in a great success.  However, there is

much more to this case.

**3.**

After she managed to create a sizeable Estate, the Debtor's subsequent management of

those Estate's funds is extremely troubling.

The Debtor expended more than $160,000.00 of Ms. Brown's entire reserve

(approximately $366,000.00) in less than two (2) years and then, virtually the entire remaining

balance on an illiquid real estate venture.  The $160,000.00 in cash disbursements represented

almost 44% of the entire value of the Estate.  When one considers that Ms. Brown was only in

her mid-60's, that there is no evidence that she was in poor physical health, and that Ms. Brown's

income was extremely modest (Social Security of less than $600 per month), the 44% reduction

in Ms. Brown's entire financial "cushion" in such a short period is alarming.  For the Debtor then

to purchase the Florida Townhouse, virtually depleting all of Ms. Brown's cash resources, in the

hope that it would generate net rental income, appears to be an extreme departure from a

reasonable, prudent management of the Estate.  The Debtor's procedural failure to obtain court

22

approval for the purchase of the Florida Townhouse and her commingling of assets by titling the

Florida Townhouse in her own name rather than her mother's adds to the chasm between her

conduct and the standard of care to which she was obliged to adhere when she agreed to serve as

her mother's guardian.[21]  The cavernous gap between the Debtor's legal duty and her actual

conduct is sufficiently extreme and obvious as to warrant the conclusion that either she was

aware of, or she willfully blinded herself to, the impropriety of her conduct.  This satisfies the

recklessness standard for defalcation in 11 U.S.C. §523(a)(4).


**4.**

The conclusion that the Debtor's breach of her fiduciary duty rose to the level of a

defalcation within the meaning of §523(a)(4) is supported not only by the overview of her

management of the Estate set out above, but also by a closer inspection of some of the actual

expenditures the Debtor made in connection with her mother's day-to-day care.  In the Debtor's

Petition for Allowance, she requested reimbursement from the Estate for $172,658.66, but was

granted only $101,000.00 (approximately) by the C.P. Court.  A substantial amount of disallowed

expense reimbursements could be characterized as a form of self-dealing.


**a.**

The Debtor requested nearly $30,000.00 for compensation for hours she and her husband

spent in rendering personal services to Ms. Brown and the Estate.  The C.P. Court reduced the

---

[21]    The inferences I draw from the Florida Townhouse transaction are discussed further in
Part IV.C.5, infra.

allowance to $17,736.00 because it found the proposed hourly rate for each of them excessive.

For example, the Debtor requested $25 per hour for 858 hours of "living assistance."  As stated

by the C.P. Court, "[the Debtor] did not demonstrate any particular experience or training to

support her claim for compensation at a rate of $25.00," and reduced it to $10.00 per hour.  She

also requested the same hourly rate for **62 hours** ($1,550.00) that she spent moving her mother to

the Oakdale Property, which the CP Court found to be "a gross overstatement in both hours spent

and compensation per hour."  The Debtor further requested $50.00 per hour for 96 hours of her

husband's labor readying the Rodney Circle Property for sale and moving Ms. Brown to the

Oakdale Property.  The State Court reduced the hourly rate by half to $25.00 per hour.

Of course, it was not inappropriate for the Debtor to request some reimbursement for the

work she and her husband provided.  Undoubtedly, it took a great deal of time and effort to repair

the Rodney Circle Property and to put Ms. Brown's daily life in order, and the Debtor may have

been replacing lost income for the time she expended fulfilling her duties as a fiduciary.  Further,

I recognize that the appropriate rate of reimbursement in a situation like this may be imprecise.

On the one hand, adult children regularly spend time assisting their elderly parents without any

expectation of compensation or reimbursement;[22] on the other hand, when that assistance is

legally formalized in a guardianship, some reimbursement can be appropriate.

The Debtor presented no testimony explaining how subjectively, she navigated between

the roles of a daughter concerned about her mother's welfare and the "arms-length" guardian

---

[22]      Here, certain expense reimbursements disallowed as excessive were for basic services
that the Debtor provided to her mother (e.g., driving her places, going to the grocery store) –  services
that many would do without any expectation of compensation.

providing services for a fee.  Nor did she explain how she determined the rate of reimbursement that the C.P. Court found to be inflated.  Left only with the list of disallowed expenses determined by the C.P. Court, I can only conclude that, after the Estate was created and as time went on,  the Debtor's intentions evolved and her moral compass wobbled.  Her initial, admirable goal of assisting her dependent mother transformed into a sense that she was entitled to share in some of the fruits of the Estate that her efforts created.

This theme  –  that the Debtor managed the Estate for her own convenience and purposes – pervades the various disallowed expense reimbursements and represents a significant shortfall in the Debtor's conduct as a fiduciary.  This improper conduct is sufficiently obvious and occurred with enough frequency that if the Debtor was not aware of her improprieties, it could only be because she wilfully turned a blind eye.  In this regard, the Debtor's state of mind rises to the level of recklessness sufficient to constitute a defalcation under 11 U.S.C. §523(a)(4).  In reaching this conclusion, I have considered not only the disallowance of a substantial portion of the $30,000.00 personal services reimbursements request, but the other disallowances set out below.

**b.**

The C.P. Court found that the rent the Debtor charged her mother to live in the Oakdale Property was excessive.  The Debtor testified that she paid herself approximately $2,000.00 per month for rent and utilities from the Estate for her mother to live in the Oakdale Property, although she requested reimbursement for only $1,560.00 per month.  (See Ex. Fogg–7, ¶12). The C.P. Court allowed only $1,210.00 per month.

While the C.P. Court's disallowance was based on the Debtor's failure to present

25

evidence of the fair rental market value of a comparable property, I find this expenditure of

Estate funds indicative of the Debtor's scienter in two (2) distinct ways.

First, the gap between the actual invasion of the Estate and the amount for which the

Debtor requested reimbursement is unexplained.  If, when the time came to account to the C.P.

Court, the Debtor could not even attempt to justify the full amount that she drew from the Estate,

what does that say about her state of mind when she actually was drawing down the funds?  I

infer that it suggests that she was not mindful at all of her duties as a guardian, and that the rent

she authorized her mother to pay had more to do with reimbursing her for most of the debt

service on the Oakdale Property, rather than attempting to use her mother's limited resources

prudently to provide her with the housing that she needed.

Similarly, the Debtor provided no explanation why she would have her mother expend

$2,000.00 per month for rent and utilities when her monthly income was $600.00.  While this

may be only a specific instance of the overall depletion of the Estate, a subject discussed earlier,

it has independent significance.  Not only does it appear to be an imprudent expenditure, but it is

one that benefitted the Debtor and her husband, by largely servicing the mortgage debt on the

second residential property that they owned.

<strong>c.</strong>

The C.P. Court disallowed other expenses that are indicative of the Debtor's

mismanagent or, at worst, self-dealing: (1) a Dumpster purchase ($590.00); and (2) PECO Bills

($2,709.46).

The C.P. Court disallowed the $590.00 for the dumpster because there was evidence that

it was delivered to 3131 Mill Road – the Debtor's personal property.  For the same reason, the

26

C.P. Court allowed the PECO Bill expense in the amount of only $783.28 because $1,926.18 was

charged to a different account with the 3131 Mill Road address.  At the trial of this proceeding, I

received no testimony regarding these specific expenses.

Even if I were to give the Debtor the benefit of the doubt  –  that those requested expenses

were included inadvertently in her Petition for Allowance due to her own neglectful organization

– her failure to comply with the basic fiduciary duty of maintaining proper accounts was

extreme.  She requested approximately $10,900.00 for reimbursement for groceries, cash and

other expenditures from January 1, 2006 through December 31, 2009, suggesting she spent

approximately $60 per week from 2006-2007 and $80 per week from 2008-2009.  However, the

Debtor produced no receipts for the time period from January 2006 through June 2007 and only

substantiated through some receipts, a figure of $30.00 per week for late 2009 through May

2010.

Similarly, the Debtor requested reimbursement another $7,800.00 for cash advances she

made to Ms. Brown for a three (3) year period.  She claimed $25.00 per week for January 2006

through December 2007 and then approximately $50.00 per week for the two (2) year period

beginning in January of 2008.  Again, she produced not one ATM receipt and the request appears

duplicative of the $10,900.00 she requested for reimbursement for "groceries, cash and other

expenditures."

**d.**

Another illustration of the large and obvious divide between the standards of conduct for

a fiduciary and the Debtor's actual conduct is the Debtor's commingling of assets.  In few

instances, the Debtor wrote checks from the Estate to herself (for cash) or for her own personal

27

expenses.  For example, the Debtor wrote a check for $2,195.83 for her home mortgage, as well

as for $180.00 for her son's camp, out of the Estate account.  The Debtor explained that in the

case of the mortgage payment, she waived one (1) month of her mother's rent and did not charge

the Estate, although the check she wrote was even greater than the inflated rent she was charging

her mother.  (N.T. at 107).  She sought to justify the check for her son's summer camp expense

by explaining that she did not have her own, personal checkbook at the time and that she later

reimbursed the Estate.   The Debtor may rationalize these actions as having been done purely for

convenience, rather than to harm the Estate, but that also is the point.  Her actions were for her

own benefit, not the Estate's, and were obviously improper.


## 5.

Finally, the Florida Townhouse purchase provides a final, powerful illustration how the

Debtor's failure to fulfill her fiduciary obligations to her mother was far more serious than

"mere" negligence.

Separate and apart from the reasonableness of depleting almost the entire balance of the

Estate funds to make the purchase in the first place, the Debtor titled the Florida property in her

own name.  I cannot understand why the Debtor did this.  At best, titling the Florida Townhouse

in her own name was a commingling of assets.  At worst, it was a giant step toward conversion of

her mother's assets.  At trial, she stated only that she planned to transfer title to her mother at

some indeterminate point in the future.  That is no explanation for titling the property in her own

name.  It is merely a rebuttal to the obvious suspicion that she was converting her mother's

assets.   While I am not prepared to make such a finding on this record, nonetheless, without

28

some reasonable explanation, the Debtor's deviation from accepted standards of conduct is immense.  Thus, even if the Debtor did not engage in this act in bad faith or with immoral intentions, and even if she was not consciously aware of the impropriety of the act, it was the product of willful blindness.  It was reckless and sufficient to satisfy the scienter requirement of 11 U.S.C. §523(a)(4).

The reckless nature of the conduct is reinforced by the $42,000.00 furniture expenditure. Given the parties' station in life, the limited size of the Estate and the existence of less expensive alternatives for furnishing a rental unit, it is difficult to see how an expenditure of that amount falls anywhere near the standard of reasonableness.[23]

# V.  CONCLUSION

For the reasons stated above, I conclude that the Debtor committed defalcation, within the meaning of 11 U.S.C. §523(a)(4) while acting in a fiduciary capacity (and in breaching that fiduciary duty) as the plenary guardian to Ms. Brown

The Debtor depleted her mother's accounts.  She wrote checks out to cash for herself and engaged in transactions that unduly benefitted herself.  She commingled Estate assets with her own.  She did little to track the flow of Estate money and failed to maintain adequate records of

---

[23]      It also raises suspicions that the "investment" in the Florida Townhouse was not made merely to generate income for the Estate, but rather for the Debtor's benefit.  I make no finding that the Debtor intended to use the Florida Townhouse for herself and her family.  Indeed, if her sole transgression in the guardianship related to the Florida Townhouse transaction, I might not perceive her conduct as reckless.  However, in the context of her overall mismanagement of the Estate, the excessive furniture expenditure appears to be a further example of her reckless failure to fulfill her fiduciary duty.

her activities.  She failed to file mandated reports with the C.P. Court.  Overall, her conduct

involved an extreme departure from the negligence standard to which fiduciaries are held, and

bordered on out-and-out self dealing.  In this course of this conduct, the Debtor, at a minimum,

blinded herself to a substantial and unjustifiable risk that her conduct would violate her fiduciary

duty to manage the Estate assets faithfully and prudently.

　　　　This case presents an excellent illustration of the "recklessness" scienter level described

by the Supreme Court in <u>Bullock</u>.  On the whole, the record does not support a finding that the

Debtor acted in bad faith, immorally or with a clear intent to steal from her mother's Estate.  Nor

is the evidence overwhelming that she subjectively and consciously understood that all of her

actions fell short of her legal duties as guardian.  But given the number of shortcomings in her

management of the Estate and the degree to which she fell short in carrying out her duties, the

evidence strongly supports the finding that the Debtor acted recklessly while serving as her

mother's financial guardian.

　　　　For these reasons, the Surcharge in the amount of $58,396.42 and the Claimed Additional

Surcharge are debts that arose from the Debtor's defalcation while acting in a fiduciary capacity.

These debts are nondischargeable pursuant to 11 U.S.C. §523(a)(4).

　　　　An appropriate order follows.

Date: **December 5, 2013**　　　 _____
                                **ERIC L. FRANK**
                                **CHIEF U.S. BANKRUPTCY JUDGE**